**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA DIVISION**

| | |
|---|---|
| Z.H., by next friend Tianna Perry, C.H., by next friend Tianna Perry, D.H., by next friend Patrice Robinson, K.H., by next friend Kimberly Spivey, and S.H., by next friend Doris Toney, | CASE NO. |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| THE CITY OF CHATTANOOGA, TENNESSEE, and CELTAIN BATTERSON, | |
| Defendants. | |

## COMPLAINT

On August 11, 2023, Defendant Celtain Batterson, at the time an Investigator with the Chattanooga Police Department ("CPD"), shot and killed Roger Heard. Roger had an arrest warrant out of Knoxville, and Batterson was leading a task force to serve the warrant. To call the operation "botched" would be a gross understatement; Batterson – who resigned during the CPD's investigation into his shooting – violated policy at every turn, putting citizens and officers at risk in a rabid approach to serving a garden-variety warrant, and ultimately killed Roger after Roger was unarmed, in an execution-style killing.

That night, Batterson was surveilling Roger at a busy Chattanooga gas station. When Batterson saw that Roger was starting his car to leave, he decided to go in. Rather than sending in uniformed officers (as was the operational plan), Batterson and his partner sped into the crowded gas station in an unmarked car without running lights or sirens. With more than a dozen people in the vicinity, the officers blocked Roger's car and Batterson got out, pulled a gun

1

on Roger, and walked up to Roger's door. Batterson was in plain clothes (jeans and a red shirt), was not wearing a visible badge, and did not identify himself as police or give Roger any warning. In the ensuing Internal Affairs ("IA") investigation, it was determined that Batterson was not easily identified as law enforcement.

Roger, seeing a large man with a gun coming at him, pushed his car door and shot at Batterson, hitting him in the arm, and fled across the parking lot. Another officer who had just arrived on the scene then shot Roger and Roger fell to the ground. When Roger went down, his gun went flying and landed several feet away, well out of reach. At that point, Roger was down, he was no longer moving, and he was unarmed.

What happened next is conscience-shocking. Batterson approached Roger lying on the ground unarmed, stood over him, and shot him approximately nine times, with one shot hitting Roger in the head and killing him. Plaintiffs, Roger's surviving children, bring suit against Batterson for killing their father in violation of the Fourth and/or Fourteenth Amendments to the U.S. Constitution, and for reckless misconduct and assault and battery under state law. In addition, Plaintiffs bring suit against the City of Chattanooga for failing to properly train and/or discipline Batterson.

## Parties, Jurisdiction, and Venue

1.     Roger Heard died unmarried. He is survived by five children, identified below.

2.     Plaintiff Z.H. is the minor child of Roger Heard and, as such, holds statutory rights under Section 20-5-106 of the Tennessee Annotated Code to pursue a wrongful death action regarding Roger's death. Plaintiff Z.H. resides in this District with her next friend and parent, Tianna Perry, who has the authority to file and pursue this action on this Z.H.'s behalf.

2

3.     Plaintiff C.H. is the minor child of Roger Heard and, as such, holds statutory rights under Section 20-5-106 of the Tennessee Annotated Code to pursue a wrongful death action regarding Roger's death. Plaintiff C.H. resides in this District with her next friend and parent, Tianna Perry, who has the authority to file and pursue this action on this C.H.'s behalf.

4.     Plaintiff D.H. is the minor child of Roger Heard and, as such, holds statutory rights under Section 20-5-106 of the Tennessee Annotated Code to pursue a wrongful death action regarding Roger's death. Plaintiff D.H. resides in this District with her next friend and parent, Patrice Robinson, who has the authority to file and pursue this action on this D.H.'s behalf.

5.     Plaintiff K.H. is the minor child of Roger Heard and, as such, holds statutory rights under Section 20-5-106 of the Tennessee Annotated Code to pursue a wrongful death action regarding Roger's death. Plaintiff K.H. resides in this District with her next friend and parent, Kimberly Spivey, who has the authority to file and pursue this action on this K.H.'s behalf.

6.     Plaintiff S.H. is the minor child of Roger Heard and, as such, holds statutory rights under Section 20-5-106 of the Tennessee Annotated Code to pursue a wrongful death action regarding Roger's death. Plaintiff S.H. resides in this District with her next friend and legal guardian, Doris Toney, who has the authority to file and pursue this action on this S.H.'s behalf.

7.     In their capacities as Roger's children, Plaintiffs are entitled to recover the full value of Roger's life and extreme pain and suffering as a result of Defendant Batterson's acts and omissions, as well as any other damages cognizable under the law.

8. Defendant Celtain Batterson is an individual who was, at all times relevant to the allegations in this complaint, an employee of the CPD, acting under color of law.

9. The City of Chattanooga, Tennessee is a Tennessee municipality which operates the CPD. The City of Chattanooga is responsible for the policies, practices, customs, and operations of the CPD, as well as hiring, training, supervising, controlling, and disciplining its officers including but not limited to Batterson.

10. All parties herein are subject to the personal jurisdiction of this Court.

11. Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(1) and (b)(2) because one or more Defendant(s) resides within the Eastern District of Tennessee and because the events giving rise to this claim occurred in the Eastern District of Tennessee.

12. All Defendants have been properly served with process in this action.

### Facts

13. On August 11, 2023, Defendant Celtain Batterson was a CPD Investigator working on Operation Street Sweeper.

14. Operation Street Sweeper's function, in part, included serving outstanding arrest warrants.

15. On that date, one of the people on whom a warrant was being served was Roger Heard, who had an outstanding warrant for nonviolent drug offenses out of Knoxville, Tennessee.

16. Batterson was in charge of the operation.

17. Batterson got word that Roger was at a Speedway gas station in Chattanooga.

18. Batterson and his partner drove to the gas station and confirmed that Roger was there, in a black Kia SUV.

19. Multiple additional officers responded quickly and parked nearby prepared to make an arrest – in both marked and unmarked vehicles.

20. The original plan was for multiple marked police vehicles to move in to arrest Roger.

21. When Roger began to pull out of the gas station, instead of sending in the marked police cars or following Roger to make a traffic stop away from the crowded gas station, Batterson and his partner sped into the parking lot and drove straight at Roger's car, head-on.

22. Batterson and his partner pulled nose-to-nose with Roger's car and Batterson immediately got out of the car, pulled a gun on Roger, and walked up to Roger's door.

23. Batterson was not in uniform when he pointed a gun at Roger.

24. Batterson was wearing jeans and a red t-shirt, neither of which in any way indicated he was law enforcement.

25. Batterson was not wearing a visible badge.

26. If Batterson was wearing a badge at all, it was hung on the holster of his gun.

27. Batterson's holster was placed low and on his hip, where his badge would not be visible to a person in front of him (i.e. a person he would be approaching with a gun).

28. When Batterson got out of the car, pulled a gun on Roger, and walked up to Roger's door, he did not identify himself as law enforcement.

29. When Batterson got out of the car, pulled a gun on Roger, and walked up to Roger's door, he did not issue any verbal warnings; he did not say "freeze, police!" or "you are under arrest!" or "police!" or "arrest warrant!" or anything else telling Roger why he was coming at him with a gun.

30.     In fact, when Batterson got out of the car, pulled a gun on Roger, and walked up to Roger's door, he did not say anything at all.

31.     In the ensuing IA investigation, CPD officials determined that Batterson was not easily identified as law enforcement.

32.     Any reasonable person in Roger's position would not have perceived the man coming at them as a police officer.  A reasonable person would have seen a big, aggressive stranger pointing a gun in his face, who meant to either kill or rob him.

33.     Roger – seeing a big, aggressive stranger pointing a gun in his face – pushed his car door and shot at Batterson, hitting him in the arm, and fled away from Batterson, across the parking lot.

34.     Another officer who had just arrived on the scene shot Roger as Roger ran away from Batterson.

35.     When the other officer shot Roger, Roger fell to the ground.

36.     When Roger fell to the ground, his gun went flying and landed several feet away, well out of reach.

37.     At that point, Roger was down, he was no longer moving, he had been shot and had surrendered, and he was unarmed.

38.     Batterson approached Roger lying on the ground unarmed, stood over him, and shot him approximately nine times.

39.     One shot hit Roger in the head and killed him.

40.     Below are screenshots from body cam video capturing Roger falling and the gun flying.  The final frame shows Batterson executing Roger when Roger was unarmed and lying on the concrete.



41.     Below are two more screenshots of the shooting.  The first is from the same body

cam; the second is from gas station surveillance.





42.     Roger's decision to shoot at Batterson was a legitimate act of self-defense.  Roger was in his car in a gas station at night when a man who did not appear to be a police officer blocked his car and walked up to his car pointing a gun in his face, never indicating he was a police officer.

43.     Batterson's decision to shoot Roger nine times after Roger was down, unarmed, and presented no danger or threat – was an execution.

44.     Batterson, through gross violations of CPD policy (and common sense), created the dangerous and volatile scenario which caused Roger to shoot at him, and which lead to Roger's death.

45.     In the ensuing CPD IA investigation, CPD officials found that Batterson was not easily recognizable as law enforcement, did not have his body armor on, and there was no evidence he activated any emergency equipment on the car when he pulled his gun on Roger and approached him.

46.     CPD officials also learned in the IA investigation that, during the pre-arrest Operation Street Sweeper briefing, Batterson told to the other officers something along the lines of, "if he got the chance to take down Heard or to get Heard that he was going to do it."

47.     As Batterson's different CPD policy violations came to light, and while Batterson was still on administrative leave for committing aggravated assault against a deputy (discussed below), CPD officials conducted a search of Batterson's office on May 1, 2024.

48.     There was also a tentative interview scheduled for Batterson on May 2, 2024, but rather than come in for an interview, Batterson resigned, effective May 1, 2024.

## Batterson's Other Internal Affairs Investigations

49.     Batterson has been the subject of at least seven legitimate IA investigations, all showing a staggering capacity for dishonesty, a true lack of judgment, an obsessiveness bordering on fanaticism, and a bent toward aggressive and assaultive behavior.

### 2015 Aggressive Pursuit and Dishonesty

50.     In November of 2015, Batterson was suspended because he was too aggressive in a police pursuit in violation of CPD policy.  He lied about the policy violations, but the IA investigation revealed the truth.

51.     Batterson was involved in a police pursuit in which he claimed that the person he was pursuing had intentionally hit his car, justifying his need to pursue aggressively.

52.     During the pursuit (i.e. in real-time), he said over the radio that the person had "just ran into my car," and that the person "just rammed my vehicle again." He wrote in an incident report after the pursuit that "the suspect turned his vehicle directly into my patrol car or into the path of my patrol car causing contact."

53.     When Batterson's superiors reviewed the video of the pursuit, they found that Batterson had hit the suspect's car from behind while pursuing it, not the other way around as he had claimed.

54.     A PIT maneuver would not have been authorized in the situation, which Batterson knew.  When confronted with the reality that he had hit the suspect from behind twice, Batterson claimed that he was not trying to PIT the suspect's car and that the contact was "unintentional."

55.     Batterson was suspended for 16 hours for the policy violations.

## 2017 Reprimand

56.     Batterson received a Letter of Reprimand in 2017 which is not found in his personnel file. Presumably, it will be produced in discovery.

## 2019 Suspension – Second Pursuit Violation

57.     Batterson was suspended for 70 hours in September of 2019 for a pursuit violation.

58.     The IA investigatory file for this serious policy violation was not found in Batterson's personnel file. Presumably, it will be produced in discovery.

59.     Batterson was found to have committed a Class II pursuit violation, Class I extra employment violation, a Class II submitting department reports violation, a Class II misrepresentation, and a Class II improper procedure violation.

60.     While the IA file has not been produced by CPD, this marks the second IA investigation in which Batterson made serious, material misrepresentations in the course of his official duties, resulting in a 70-hour suspension.

## 2019 Discourtesy

61.     In November of 2019, Batterson was reprimanded for being discourteous to a member of the public. Batterson refused to provide his name and badge number to a citizen who had asked.

## 2023 Insubordination and Unsatisfactory Performance

62.     After he shot and killed Roger on August 11, 2023, Batterson was placed on administrative leave.

63.     On August 12, 2023, the day after Roger's death, Batterson was informed that he was being placed on administrative leave for a week.

11

64.    During the next week while he was on administrative leave, Batterson inserted himself into police investigations in violation of his leave, despite direct orders from his superiors to stop.

65.    The investigation into these policy violations never reached a formal conclusion since Batterson resigned on May 1, 2024, but the IA report reflects that Batterson committed Level II Insubordination and Unsatisfactory Performance.

### 2024 Felony Aggravated Assault (and Influencing a Witness)

66.    In February of 2024, while he was still under investigation for Roger's death (and his insubordination in the wake of Roger's death), Batterson was relieved of duty and placed on administrative leave after he assaulted a deputy with the Hamilton County Sheriff's Office ("HCSO").

67.    On February 10, 2024, Batterson went to the Erlanger Emergency Room where a colleague (a fellow CPD officer) was working a moonlighting job; Batterson was bringing the colleague dinner.

68.    Batterson was off-duty and not on official business but was wearing his typical work clothes including his gun and badge, which allowed him to be in an area which was restricted from the general public; the IA investigation revealed that he "used his authority as a police officer dressed in his soft uniform to act outside the scope of his responsibility."

69.    While Batterson was at the hospital, he got into a conversation with his CPD colleague and a female HCSO deputy about Taser use.

70.    The conversation turned to talk about being Tased when, without warning and certainly without consent, Batterson unholstered his CPD colleague's Taser and Tased the HCSO deputy three inches above her right knee.

12

71.     The deputy sustained burns from the Taser, and she reported the incident to her superiors.

72.     On February 15, 2024, once Batterson found out that there was an investigation into the incident, he called the deputy directly and obtained information relating to the IA investigation prior to being interviewed himself.

73.     Batterson also tried to influence the deputy's story. During the call, Batterson claimed that the deputy had "asked for it." She had not.

74.     Batterson also played on the deputy's sympathies, telling the deputy that he was now under investigation and was at risk of losing his job.

75.     Batterson also told the deputy he didn't know why CPD was making such a big deal out of everything.

76.     The next day, February 16, 2024, Batterson was placed on administrative leave pending the outcome of the IA investigation.

77.     After Batterson was placed on leave, he again tried to influence the deputy. Batterson texted the deputy to tell her that his badge had been taken, and he asked if she had retracted her story.

78.     In the IA investigation, Batterson admitted to calling and texting the deputy, but claimed he was not trying to coerce or influence the deputy.

79.     When asked directly about the contents of the February 15 phone call to the deputy, he lied about the more damning aspects of the call.

80.     Batterson claimed he did not tell the deputy she had "asked for it," and that he had not told the deputy he did not understand why the agency was making "such a fuss" about the felony aggravated assault.

13

81.     In the IA investigation, Batterson claimed that he Tased and burned the deputy as an "educational experience" for the deputy.

82.     Batterson is not certified to provide Taser training or conduct training scenarios.

83.     Ultimately, CPD officials determined that when Batterson Tased and burned the deputy, he had committed aggravated assault, a Class C felony carrying a three- to fifteen-year prison sentence.

84.     In the IA investigation, Batterson acknowledged that the incident "could be viewed as an aggravated assault."

85.     Very luckily for Batterson, the deputy did not want Batterson prosecuted for committing felony aggravated assault against her.

86.     The investigation into Batterson's felony aggravated assault never reached a formal conclusion since Batterson resigned on May 1, 2024.

**COUNT I**
**Excessive Force**

87.     Plaintiffs incorporate by reference paragraphs 1 through 86 of this Complaint as if fully stated herein.

88.     Defendant Batterson used excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution when he shot and killed Roger.

89.     Batterson shot and killed Roger after Roger had already been shot and gone down, and after Roger's gun went flying and landed several feet away, well out of reach.

90.     At that point, Roger was down, he was no longer moving, and he was unarmed; he presented no threat of injury to anybody.

14

91.     Despite the fact that Roger did not present a threat to anybody, Batterson approached Roger lying on the ground unarmed, stood over him, and shot him approximately nine times.

92.     One shot hit Roger in the head and killed him.

93.     Batterson had no valid reason for this use of deadly force.

94.     At all times material hereto, Batterson was acting under color of law as a CPD Investigator.

95.     Plaintiffs claim damages for the injuries set forth above under the Fourth and Fourteenth Amendments to the U.S. Constitution against Batterson for violations of Roger's constitutional rights under color of law.

## COUNT II
## Municipal Liability

96.     Plaintiffs incorporate by reference paragraphs 1 through 86 of this Complaint as if fully stated herein.

97.     Defendant the City of Chattanooga, operating through the CPD, committed acts and omissions under color of law in its capacity as a state actor, causing Roger's death and depriving him of his Constitutional rights.

98.     In deprivation of Roger's Constitutional rights, the City of Chattanooga/CPD failed to adequately train its officers in the proper use of force in situations such as those presented in this case and/or failed to adequately discipline its officers for policy and ethical violations, including the use of unnecessary force.

99.     The City of Chattanooga/CPD created and/or allowed an environment to exist at CPD whereby officers believed they could use excessive force on individuals without being

adequately punished for doing so, which made the incident at issue in this case foreseeable and preventable.

100.    With regard to Batterson specifically, the City of Chattanooga/CPD kept Batterson on the force, allowed him to carry a weapon, allowed him to make arrests via Operation Street Sweeper, and allowed him to take operational control of Operation Street Sweeper – all while knowing that he had the internal affairs history outlined above, which in August of 2023 included two separate prior incidents where he acted with aggression and dishonesty, such as ramming a vehicle during a pursuit then lying about it, as well as other potential incidents to be developed in discovery.

101.    Policymakers for the City of Chattanooga/CPD were aware of the inadequate training and discipline issues, aware specifically of Batterson's capacity for dishonesty, lack of judgment, obsessiveness bordering on fanaticism, and bent toward aggressive and assaultive behavior.

102.    Policymakers for the City of Chattanooga/CPD turned a blind eye to these training and discipline issues, and to Batterson's troubling history, creating a custom, pattern, and practice that allows officers to ignore written policies and receive no meaningful retribution or punishment for violating those policies, and giving Batterson reason to believe such conduct was tolerated or encouraged at the CPD.

103.    As a direct and proximate cause of these constitutional violations by the City of Chattanooga, Roger was killed.

104.    Plaintiffs claim damages for the injuries set forth above under the Fourth and Fourteenth Amendments to the U.S. Constitution against the City of Chattanooga for violations of Roger's constitutional rights under color of law.

## COUNT III
## State Law – Reckless Misconduct

105.    Plaintiffs incorporate by reference paragraphs 1 through 86 of this Complaint as if fully stated herein.

106.    Batterson's entire approach to Roger's arrest was reckless.

107.    Batterson and his partner sped their unmarked vehicle into the parking lot and drove straight at Roger's car, head-on, without running lights or sirens.

108.    Batterson then pulled a gun on Roger and rushed Roger's door.

109.    Batterson was not in uniform when he pointed a gun at Roger; he was wearing jeans and a red t-shirt, neither of which in any way indicated he was law enforcement.

110.    In addition, if Batterson was wearing a badge, the badge was hung on the holster of his gun, on his hip and to the side, where his badge would not be visible to a person in front of him (i.e. a person he would be approaching with a gun).

111.    When Batterson got out of the car, pulled a gun on Roger, and walked up to Roger's door, he did not identify himself as law enforcement or issue any sort of verbal warning.

112.    In the ensuing IA investigation, CPD officials determined that Batterson was not easily identified as law enforcement.

113.    Defendant Batterson committed reckless misconduct under Tennessee law when he rushed Roger with a gun, knowing that he and his partner had just sped towards him head-on in an unmarked car without running lights or sirens, knowing that he (Batterson) was in plain clothes without a visible badge, and failing to announce himself as a police officer.

114.    When Batterson rushed Roger with a gun, he was aware of, but consciously disregarded, a substantial and unjustifiable risk of such a nature that its disregard constituted a

17

gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

115.    This sequence of events caused Roger's death.

116.    In addition, Batterson committed reckless misconduct when he shot Roger after Roger had been shot, gone down, and after Roger's gun went flying and landed several feet away, well out of reach.

117.    At that point, Roger was down, he was no longer moving, and he was unarmed; he presented no threat of injury to anybody.

118.    Despite the fact that Roger did not present a threat to anybody, Batterson approached Roger lying on the ground unarmed, stood over him, and shot him approximately nine times.

119.    One shot hit Roger in the head and killed him.

120.    Batterson had no valid reason for this use of deadly force.

121.    Batterson's use of deadly force was reckless.

122.    When Batterson shot Roger approximately nine times after Roger was on the ground and unarmed, he was aware of, but consciously disregarded, a substantial and unjustifiable risk of such a nature that its disregard constituted a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

123.    At all times material hereto, Batterson was acting under color of law as a CPD Investigator.

124.    Plaintiffs claim damages for the injuries set forth above under Tennessee law against Batterson for their father Roger's death.

## COUNT IV
## State Law - Assault and Battery

125.     Plaintiffs incorporate by reference paragraphs 1 through 86 of this Complaint as if fully stated herein.

126.     Defendant Batterson committed assault and battery under Tennessee law when he rushed Roger with a gun and when he shot and killed Roger.

127.     Batterson and his partner sped their unmarked vehicle into the parking lot and drove straight at Roger's car, head-on.

128.     Batterson then pulled a gun on Roger and rushed Roger's door.

129.     Batterson was not in uniform when he pointed a gun at Roger; he was wearing jeans and a red t-shirt, neither of which in any way indicated he was law enforcement.

130.     In addition, if Batterson was wearing a badge, the badge was hung on the holster of his gun, on his hip and to the side, where his badge would not be visible to a person in front of him (i.e. a person he would be approaching with a gun).

131.     When Batterson got out of the car, pulled a gun on Roger, and walked up to Roger's door, he did not identify himself as law enforcement or issue any sort of verbal warning.

132.     In the ensuing IA investigation, CPD officials determined that Batterson was not easily identified as law enforcement.

133.     This sequence of events – Batterson's rushing Roger while pointing a gun at him, knowing that he and his partner had just sped towards him head-on in an unmarked car without running lights and sirens, knowing that he (Batterson) was in plain clothes without a visible badge, and failing to announce himself as a police officer – amounted to assault and battery under Tennessee law.

134.     This sequence of events caused Roger's death.

19

135.    In addition, Batterson committed assault and battery against Roger when he shot Roger after Roger had been shot, gone down, and after Roger's gun went flying and landed several feet away, well out of reach.

136.    At that point, Roger was down, he was no longer moving, and he was unarmed; he presented no threat of injury to anybody.

137.    Despite the fact that Roger did not present a threat to anybody, Batterson approached Roger lying on the ground unarmed, stood over him, and shot him approximately nine times.

138.    One shot hit Roger in the head and killed him.

139.    Batterson had no valid reason for this use of deadly force.

140.    Batterson's use of deadly force was willful and malicious.

141.    At all times material hereto, Batterson was acting under color of law as a CPD Investigator.

142.    Plaintiffs claim damages for the injuries set forth above under Tennessee law against Batterson for their father Roger's death.

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiffs pray that this Court issue the following relief:

1)  That process issue in accordance with the law;

2)  That the Court award Plaintiffs compensatory and general damages in an amount of not less than the full value of Roger's life and extreme pain and suffering as a result of Defendant Batterson's acts and omissions, as well as any other damages cognizable under the law.

3)  That the Court award punitive damages in an amount to be determined by the enlightened conscience of the jury against the Defendants;

20

4) That the Court award costs of this action, including attorneys' fees, to Plaintiffs, pursuant to any applicable laws regarding such awards;

5) That pre- and post- judgment interest be awarded to Plaintiffs under federal statutes and case law;

6) That the Court award Plaintiffs such other and further relief as it deems just and necessary; and

7) That Plaintiffs be granted a trial by jury.

This 7th day of August, 2024

*s/McCracken Poston*
McCracken Poston (BPR #020375)
Law Offices of McCracken Poston
7713 Nashville Street
Ringgold, Georgia 30736
Telephone: (706) 965-8300
Facsimile: (706) 965-5413
postonlaw@gmail.com

Jonathan D. Grunberg (will seek admission *pro hac vice*)
Georgia State Bar No. 869318
Wade, Grunberg & Wilson, LLC
600 Peachtree St. NE, Suite 3900
Atlanta, GA 30308
Telephone: (404) 600-1153
Facsimile: (404) 969-4333
jgrunberg@wgwlawfirm.com

Mark Begnaud (will seek admission *pro hac vice*)
Georgia Bar No. 217641
mbegnaud@eshmanbegnaud.com
Michael J. Eshman (will seek admission *pro hac vice*)
Georgia Bar No. 365497
meshman@eshmanbegnaud.com
Eshman Begnaud, LLC
315 W. Ponce De Leon Ave
Suite 775
Decatur, GA 30030

21

404-491-0170

*Attorneys for Plaintiffs*